UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

SHAWN G. DILLINGHAM,

                      Plaintiff,

          V.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

——————————————————————————

**REPORT AND
RECOMMENDATION**

09-CV-236
(GLS/VEB)

## I. INTRODUCTION

In November of 2004, Plaintiff Shawn G. Dillingham applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act.  Plaintiff alleges that he has been unable to work since August 15, 2004, due to several physical and mental impairments.  The Commissioner of Social Security denied Plaintiff's applications.  Plaintiff, by and through his attorneys, Olinsky & Shurtliff, Jaya Shurtliff, Esq., commenced this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

On July 22, 2010, the Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 19).

## II. BACKGROUND

The relevant procedural history may be summarized as follows:

Plaintiff applied for SSI benefits and DIB on November 5, 2004, alleging disability beginning on August 15, 2004. (T at 44, 165).[1]  The applications were denied initially on February 3, 2005. (T at 29).  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), but completed and signed a written waiver of his right to appear at the hearing. (T at 35).

On January 26, 2006, ALJ Joseph G. Medicis, Jr. issued a decision denying Plaintiff's applications. (T at 16-22).  Plaintiff timely requested review by the Appeals Council, which denied the request on May 18, 2006. (T at 6-8).  On July 17, 2006, Plaintiff, through counsel, commenced an action in the United States District Court for the Northern District of New York, which was assigned case number 06-CV-862.  On April 12, 2007, the Honorable Randolph F. Treece, United States Magistrate Judge, issued a Consent Order remanding the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405 (g). (T at 194-95).  On remand, the Appeals Council referred the matter to ALJ Medicis for further proceedings. (196-99).

ALJ Medicis held a hearing on January 17, 2008, in Syracuse, New York.  Plaintiff appeared with counsel and testified. (T at 385-416).  On February 13, 2008, the ALJ issued a decision denying Plaintiff's applications. (T at 183-93).  The ALJ's decision became the Commissioner's final decision on January 17, 2009, when the Appeals Council denied Plaintiff's request for review.  (T at 169-171).

Plaintiff timely commenced this action on February 26, 2009. (Docket No. 1).  The Commissioner interposed an Answer on July 22, 2009. (Docket No. 8).  Plaintiff filed a Brief

---

[1]Citations to "T" refer to the Administrative Transcript.  (Docket No. 9).

in support of the action on January 4, 2010. (Docket No. 13).  The Commissioner filed a Brief in opposition on February 18, 2010. (Docket No. 18).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

For the reasons that follow, it is respectfully recommended that the Commissioner's motion be denied, Plaintiff's motion be granted, and that this case be remanded for further administrative proceedings.

## III. DISCUSSION

### A.    Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.[2]

---

[2]This five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n. 5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

## B.    Analysis

### 1.    Commissioner's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2009. (T at 186).  The ALJ also determined that Plaintiff had not engaged in substantial gainful activity since August 15, 2004, the alleged onset date. (T at 186).  The ALJ concluded that Plaintiff had the following impairments considered severe under the Act: generalized anxiety disorder (mild-to-moderate) and alcohol abuse

---

If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

in questionable remission. (T at 186).  However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments set forth in 20 CFR Part 404, Subpart P, Appendix I (the "Listings"). (T at 189).

The ALJ determined that Plaintiff had the residual functional capacity to perform medium work, with some non-exertional limitations. (T at 190).  The ALJ concluded that Plaintiff had not demonstrated an inability to perform his past relevant work but, out of an abundance of cautions, he proceeded on the assumption that Plaintiff had made such a showing. (T at 192).

Considering Plaintiff's age (47 on the date of alleged onset), education (limited), work experience, and RFC, the ALJ concluded that Plaintiff was able to perform a significant number of jobs in the national economy. (T at 192).  Thus, the ALJ found that Plaintiff had not been under a disability as defined under the Act from the date of onset to the date of the ALJ's decision. (T at 192).  As noted above, the ALJ's decision became the Commissioner's final decision on January 17, 2009, when the Appeals Council denied Plaintiff's request for review.  (T at 169-171).

### 2.    Plaintiff's Claims

Plaintiff challenges the Commissioner's decision.   He offers five (5) principal arguments in support of this position.  First, Plaintiff contends that the ALJ erred with respect to the severity analysis at step two of the sequential evaluation.  Second, he argues that the ALJ failed to follow the treating physician's rule.  Third, Plaintiff challenges the ALJ's RFC determination.  Fourth, Plaintiff asserts that the ALJ did not properly evaluate his credibility.  Fifth, he contends that the ALJ should have consulted a vocational expert. This Court will address each argument in turn.

### a.    Severity of Impairments

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The following are examples of "basic work activities": "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations." Gibbs v. Astrue, No. 07-Civ-10563, 2008 WL 2627714, at *16 (S.D.N.Y. July 2, 2008); 20 C.F.R. § 404.1521(b)(l)-(5).  The claimant bears the burden of presenting evidence establishing severity. Miller v. Comm'r of Social Sec., No. 05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008); see also 20 C.F.R. § 404.1512(a).

Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995). Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727 at *5 (E.D.N.Y. March 19,1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

In this case, the ALJ rejected Plaintiff's arguments that his diverticulitis, degenerative disc disease of the lumbar spine, transitional rib pain, and unspecified sleep disorder were

"severe" impairments. (T at 186).   Plaintiff challenges the ALJ's decision as to the degenerative disc disease of his lumbar spine and his diverticulitis.  Plaintiff contends that these impairments are severe.

With regard to the lumbar spine, Plaintiff points to x-ray testing indicating spondylosis between the L3 and L5 vertebrae. (T at 311).  Plaintiff was treated with pain medication by his primary care physician. (T at 328, 338, 362, 365).  A report from the New York Pain Center indicated a diagnosis of lumbar paraspinous tenderness and antalgic gait, with an initial impression of mechanical low back pain and lumbar radiculopathy. (T at 325). MRI results indicated mild disc bulging and early degenerative changes. (T at 326).  Plaintiff testified that he experiences "constant" back pain, which he described as a "quite severe" stabbing pain. (T at 396-97). Plaintiff described the pain as a nine or a ten on a scale of one to ten, with ten being the most severe pain. (T at 397).  He indicated that the pain would prevent him from sitting for more than ten minutes before needing to change positions. (T at 398).  Plaintiff testified that he could only stand for fifteen minutes before needing to sit down. (T at 398).

Concerning diverticulitis, Plaintiff points to September 2005 treatment in the emergency room for abdominal pain, at which point CT scans indicated diverticulitis of the sigmoid colon. (T at 290, 297).  Repeat CT scans continued to show diverticulitis, along with other gastrointestinal disorders. (T at 242, 285).

For the following reasons, this Court finds the ALJ's conclusion that these impairments were not "severe" as defined under the Act was supported by substantial evidence.  Regarding Plaintiff's lumbar issues, when asked in December 2004 to state the illnesses, injuries, or conditions that limit his ability to work, Plaintiff listed "Sleep

disorder/depression," with no mention of any back pain. (T at 49).[3]   In fact, Plaintiff indicated that his illness, injuries, or conditions did not cause him pain. (T at 50).

In addition, the clinical findings were generally mild and frequently associated with heavy lifting or other rigorous activities.  For example, Plaintiff was treated in an emergency room for lower back pain in September 2005 following an altercation with his brother. (T at 304).   Images of Plaintiff's lumbar spine showed normal vertebral body height and alignment and no bone destruction. (T at 310).  A mild narrowing of the disc space between L4 and L5 was noted. (T at 310).  Plaintiff was discharged with Motrin and Tylenol. (T at 305).

An October 2007 visit to the Pain Center was brought on by heavy lifting. (T at 324). Although the treating nurse practitioner gave an initial impression of mechanical low back pain and lumbar radiculopathy (T at 325), subsequent imaging showed only "mild" disc bulging and early degenerative changes, with no evidence of focal disc herniation or nerve root entrapment. (T at 326).

With respect to diverticulitis, a July 2006 treatment note indicated that Plaintiff's condition was "better now" and he was not planning to see a gastrointestinal specialist. (T at 360).  Dr. Ajoy Roy performed a colonoscopy and esophagogastroduodenoscopy on April 12, 2007.  Notes from a follow-up visit indicated that Plaintiff had no complaints and had not experienced any return of abdominal pain. (T at 314).  Endosonographic images of the rectum were taken on December 12, 2007, and noted to be "unremarkable." (T at 320).

---

[3]Plaintiff also did not mention any gastrointestinal problems in the December 2004 disability report, but this is not as significant because Plaintiff was not diagnosed with diverticulitis until September of 2005.

As noted above, the claimant bears the burden of proving severity.  In light of the foregoing, this Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not meet that burden with respect to these two impairments.

Lastly, because the ALJ concluded that Plaintiff's anxiety disorder was a severe impairment and continued with the sequential analysis, any errors in his findings at step two of the analysis were harmless.  See Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987)("[T]he Secretary found that Maziarz suffered from the severe impairment of coronary artery disease, status post right coronary artery angioplasty and angina pectoris. Accordingly, the Secretary continued with the remaining steps in his disability determination. Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error."); McCartney v. Commissioner of Social Sec., Civil Action No. 07-1572, 2009 WL 1323578, at *16 (W.D.Pa. May 8, 2009)("Even if the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments."); Portorreal v. Astrue, No. C.A. 07-296ML, 2008 WL 4681636, at *3 (D.R.I. Oct. 21, 2008).

Accordingly, this Court finds no reversible error as to this aspect of the ALJ's decision does not recommend remand as to this issue.

### b.    Treating Physician's Rule

Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.2000).[4]

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  In this regard, the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); see also de Roman, 2003 WL 21511160, at *9; Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir.1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

In this case, Plaintiff's treating physician, Dr. Mohammed Ahmed, completed a Physical & Mental Medical Source Statement in January of 2008.  Dr. Ahmed indicated that Plaintiff's pain and other symptoms were severe enough to interfere with attention and concentration constantly. (T at 329).  He opined that Plaintiff had a marked limitation in his ability to deal with work stress and could sit or stand for less than 2 hours in an 8-hour work

---

[4]"The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

day. (T at 329).  Dr. Ahmed indicated that Plaintiff would need to take an unscheduled break every 10 to 15 minutes during the day. (T at 330).  He assessed that Plaintiff could frequently lift less than 10 pounds, but could never lift more than that. (T at 330).

Concerning Plaintiff's mental impairments, Dr. Ahmed opined that he had poor or no ability to complete a regular workday and workweek without interruptions from psychologically based symptoms; and poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods. (T at 332).

Dr. Ahmed indicated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a month. (T at 333).

The ALJ concluded that Dr. Ahmed's assessment of Plaintiff's limitations was contradicted by his own treatment notes, MRI results, and the overall conservative course of treatment.  (T at 189).  Concerning Dr. Ahmed's mental health assessment, the ALJ described the doctor as "a very caring but perhaps not entirely thoroughgoing reporter." (T at 191).  In addition, the ALJ noted that Dr. Ahmed was not a psychiatric specialist. (T at 191).  Further, the ALJ concluded that Plaintiff's non-compliance with psychiatric treatment indicated that the symptoms were not as severe as indicated by Dr. Ahmed. (T at 191).

### i.    Physical Limitations

This Court finds that the ALJ's evaluation of Dr. Ahmed's opinion with respect to Plaintiff's physical limitations was supported by substantial evidence.  The ALJ was obligated to consider the consistency of Dr. Ahmed's opinion with the record as a whole. See Pardee v. Astrue, 631 F.Supp.2d 200, 210 (N.D.N.Y. 2009).  In this regard, the ALJ correctly noted that Dr. Ahmed's finding of dramatic physical limitations was contradicted by the clinical notes made over the long course of Plaintiff's treatment.  These notes

12

described largely generalized complaints of "aches and pains," with a conservative course of treatment.

For example, a November 2004 note indicated that Plaintiff had pulled a muscle behind his left knee a month earlier and experienced some relief by wearing an ace bandage. (T at 126).  Notes from February and March of 2006 explained that Plaintiff continued to "have his usual aches and pains . . . ." (T at 365, 367).  Plaintiff denied any acute illness. (T at 365).  Plaintiff was concerned about a pain in the bottom of his foot.  (T at 365).  A June 2006 note indicated that Plaintiff was "still working lite duties." (T at 361).

In general, the treatment notes demonstrated a pattern of routine visits primarily associated with adjustments to medication and prescription refills, with some complaints of "usual aches and pains."  These notes are clearly at odds with Dr. Ahmed's assessment of constant, disabling pain and severe exertional limitations.  Moreover, as the ALJ noted, Plaintiff was never referred to an orthopedic specialist, which would be expected if his limitations were as severe as Dr. Ahmed indicated.[5]  Moreover, as mentioned above, an MRI of the spine in October 2007 showed only mild disc bulging and early degenerative changes. (T at 326).

Further support for the ALJ's conclusion is found in the consultative report prepared by Dr. Kalyani Ganesh.  Dr. Ganesh noted that Plaintiff appeared to be in no acute distress, with normal gait, and the ability to walk on heels and toes without difficulty, squat full, and arise from a chair without difficulty.  (T at 136).  Dr. Ganesh found that Plaintiff's cervical

---

[5]By way of comparison, Dr. Ahmed referred Plaintiff to a specialist for treatment of a callus on his foot. (T at 365).

spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally.  No abnormality was noted in the thoracic spine.  The lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally.  (T at 136).  A full range of motion was noted as to shoulders, elbows, forearms, hips, knees, ankles, and wrists bilaterally. (T at 136).  Dr. Ganesh assessed "[n]o physical limitations to sitting, standing, walking, or the use of upper extremities." (T at 137).  In addition, a State Agency review analyst indicated that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (T at 143-45).

Plaintiff argues that the ALJ was obliged to re-contact Dr. Ahmed to explain the inconsistency between his assessment and the overall medical record.  However, as the Second Circuit has held, "[w]hile the opinions of a treating physician deserve special respect, ... they need not be given controlling weight when they are contradicted by other substantial evidence ..." Veino v. Barnhart, 312 F.3d 578, 588 (2nd Cir.2002) (citations omitted); see also Hogue v. Barnhart, No. 03-CV-4963, 2005 WL 1036336, at *14 (S.D.N.Y.2005) ("An ALJ need not seek further explanation from treating physicians each time there is an inconsistency in medical opinions.").  Moreover, the ALJ's responsibility to weigh the evidence would be "rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to conform his opinion to the evidence." Rebull v. Massanari, 240 F. Supp.2d 265, 273 (S.D.N.Y.2002).

Here, the record contained numerous treatment notes and records from Dr. Ahmed and other providers, covering an extensive period of time, along with clinical findings and diagnostic test results.  The record also contained a consultative report and assessment

of a State Agency review analyst.  In other words, the medical record concerning Plaintiff's physical limitations was complete and well-documented.  Accordingly, this Court finds that the ALJ was not obliged to re-contact Dr. Ahmed concerning Plaintiff's physical limitations. Moreover, this Court finds that a remand is not necessary as to this issue.

### ii.    Mental Limitations

The Court does, however, find error with regard to the ALJ's decision to discount Dr. Ahmed's mental limitation findings.  As noted above, Dr. Ahmed opined that Plaintiff had poor or no ability to complete a regular workday and workweek without interruptions from psychologically based symptoms; and poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods. (T at 332).  He also indicated that Plaintiff had only a "fair" ability to deal with normal work stress, travel in unfamiliar places, or use public transportation. (T at 332).

Dr. Ahmed's assessment was consistent with his treatment notes, which indicated frequent and continuing complaints of anxiety and the treatment of Plaintiff's mental problems with varying doses of prescription medication. (T at 126, 128, 356, 362, 365, 367).  An April 2005 treatment note indicated that Plaintiff "cannot work [with] people, phobic, disability." (T at 375).

In support of his decision to discount Dr. Ahmed's assessment, the ALJ points to a January 2005 treatment note indicating that Plaintiff was having sleep and anxiety problems, but was not interested in seeing a psychiatrist at that time. (T at 128). Apparently, the ALJ intended this reference to suggest that Plaintiff's lack of interest in seeking treatment was indicative of a less severe impairment.  However, Plaintiff did, in fact, follow Dr. Ahmed's recommendation and was evaluated at the Oswego Hospital

Behavioral Services Division on March 22, 2005. (T at 382).  Thus, Plaintiff's stated lack of interest in seeking psychiatric help in January 2005 has very little probative value, given his decision shortly thereafter to seek such help.

Moreover, this aspect of the ALJ's decision highlights a larger problem with his analysis.  The ALJ clearly discounted Dr. Ahmed's findings and Plaintiff's testimony concerning mental limitations because of Plaintiff's non-compliance with psychiatric treatment.  However, the ALJ's assessment in this regard is not supported by the evidence. The facts concerning Plaintiff's psychiatric treatment are as follows:

Plaintiff was assessed by a social worker at the Oswego Hospital Behavioral Services Division in March 2005.  (T at 382).  Dr. Stanley Poreba of the Behavioral Services Division performed a psychiatric/outpatient assessment in May of that year. (T at 380).  Dr. Poreba saw Plaintiff again a month later. (T at 379).  Plaintiff was seen by Dr. Lewis Malgieri in August of 2006. (T at 378).

A termination summary indicates that Plaintiff was terminated from the Behavioral Services Division because he failed to appear for one appointment and had no contact with the facility thereafter. (T at 377).  The termination date is unclear, as the "termination summary" is initially dated September 30, 2005, but indicates dictation and transcription dates in September and October of 2006. (T at 377).  The summary was prepared by Robin Brown, SWA and the date beneath her signature is October 24, 2006.  These facts strongly support the conclusion that the report was prepared in the fall of 2006.  As such, the summary is inaccurate in that it states that Plaintiff had no contact with the facility since a June 2005 visit with Dr. Poreba.  In fact, Plaintiff was seen by Dr. Malgieri in August 2006. (T at 378).

16

The ALJ made the following finding: "the termination report subsequently issued by that agency [the Behavioral Services Division] shows that he only came for his sessions for about a month and then simply failed to show up for further scheduled appointments, suggesting that symptoms probably were not so bad after all." (T at 188).

This finding is problematic in several respects. First, the ALJ accepted the termination summary uncritically. However, as noted above, a review of the record shows that the termination summary does not accurately report Plaintiff's treatment history (in that is fails to account for an August 2006 visit). Second, contrary to the ALJ's references to "further scheduled appointments" (emphasis added) and "several missed sessions," the termination report references only one missed appointment. (T at 377). This Court expresses some surprise that a mental health facility would terminate a patient after one missed appointment, even if the patient made no further attempts to contact the facility. Moreover, the August 2006 visit with Dr. Malgieri obviously qualifies as a contact with the facility, a point the termination summary ignores. In any event, the record does not support the ALJ's finding of multiple missed appointments. In fact, it appears Plaintiff may have been terminated from the program based upon incorrect information. The ALJ took no note of any of these puzzling contradictions and inconsistencies and thus made no attempt to reconcile them with his findings.

Third, the ALJ relied upon his questionable findings of Plaintiff's non-compliance with treatment to discount Dr. Ahmed's findings. However, the ALJ did not adequately account for the fact that other evidence in the record was consistent with Dr. Ahmed's findings. For example, the ALJ makes no mention of Dr. Poreba's May 2005 assessment. Dr. Poreba gave Plaintiff a Global Assessment Functioning ("GAF") score of 50. (T at 381). "A GAF

range of 41-50 indicates that the individual has a 'serious impairment in one of the following: social, occupational, or school functioning.'" Pollard v. Halter, 377 F.3d 183, 186 n.1 (2d Cir. 2004).  Dr. Poreba described Plaintiff's affect as "constricted" and his mood as "depressed." (T at 381). Likewise, Dr. Malgieri described Plaintiff as suffering from a "great deal of tension." (T at 378).  Dr. Barry, the consultative examiner, described Plaintiff's prognosis as "guarded," and indicated that he appeared anxious and to have difficulty handling stressors. (T at 140-41).  Dr. Barry further assessed that Plaintiff would have difficulty relating adequately with others and that Plaintiff's allegations were consistent with the examination results. (T at 140).  Dr. Barry recommended psychiatric treatment with medication. (T at 141).

Finally, although the Commissioner generally gives "more weight to the opinion of a specialist upon medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist," 20 C.F.R. § 404.1527(d)(5), the fact that Dr. Ahmed was not a psychiatrist does not, without more, justify the ALJ's decision to discount his findings.

As noted above, Dr. Ahmed's mental limitation findings were consistent with his treatment notes and other evidence.   Important evidence supporting Dr. Ahemd's assessment (e.g. Dr. Poreba's GAF score) was not even discussed.  Further, the ALJ placed heavy emphasis upon Plaintiff's termination from treatment without reconciling apparent discrepancies concerning the basis and timing of termination.  This error was compounded by the ALJ's failure to re-contact the Behavioral Services Division and/or ask Plaintiff about the circumstances or reasons for his non-compliance with treatment. Accordingly, this Court finds that the ALJ's decision to discount Dr. Ahmed's mental

limitation findings was not supported by substantial evidence and that a remand is therefore required.  On remand, Dr. Ahmed's mental limitation findings should be revisited, with proper consideration given to the other evidence of record.  In addition, to the extent that Plaintiff's non-compliance with treatment is deemed to contradict Dr. Ahmed's findings, further development of the record is necessary to determine the nature and extent of the non-compliance.

### c.    RFC Determination

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.1999).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).  An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y.1990).

In this case, the ALJ found that Plaintiff retained the RFC to perform medium work "except perhaps work involving unusually high cognitive/emotional demands such as complex intellectual work or constant unusual stressors." (T at 190).  The ALJ concluded that Plaintiff could "certainly perform all the basic mental demands of basic, simple,

repetitive entry level work." (T at 190).

Plaintiff challenges the RFC assessment on two (2) grounds. First, Plaintiff contends that it is at odds with Dr. Ahmed's assessments. Second, Plaintiff argues that the ALJ erred by failing to provide a function-by-function finding of Plaintiff's ability to perform exertional work activities.

For the reasons stated above, this Court finds that the ALJ's decision to discount Dr. Ahmed's opinion as to Plaintiff's physical limitations was supported by substantial evidence. In contrast, the ALJ's RFC determination with regard to Plaintiff's mental impairments was flawed and will necessarily need to be revisited on remand for the reasons outlined above. This leaves the question of whether the ALJ's RFC determination concerning Plaintiff's physical limitations can be sustained even though the ALJ did not provide a function-by-function analysis.

SSR 96-8p provides that the ALJ's RFC assessment must include a function-by-function analysis of the claimant's functional limitations or restrictions and an assessment his or her work-related abilities on a function-by-function basis. With regard to physical limitations, this means the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y.1999). Once the function-by-function analysis is completed, the RFC be expressed in terms of exertional levels of work, *e.g.,* sedentary, light, medium, heavy, and very heavy. Hogan v. Astrue, 491 F.Supp.2d 347, 354 (W.D.N.Y.2007).

The Commissioner concedes that the ALJ failed to set forth a function-by-function analysis, as required by SSR 96-8p. (Docket No. 18, at p. 13-14). The Second Circuit has

not yet decided whether non-compliance with SSR 96-8p is *per se* grounds for a remand.

At least two circuit courts of appeals have concluded that "[a]lthough a function-by-function analysis is desirable, the ALJ need not discuss each factor in his written opinion." Delgado v. Comm'r of Soc. Sec., 30 Fed. App'x 542, 547-48 (6th Cir.2002) (quoting Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir.2000)).

District courts in the Second Circuit have reached different conclusions, with courts in the Northern District of New York generally concluding that a remand is required. See, e.g., Wood v. Comm'r of Soc. Sec., No. 06-CV-157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009)(collecting cases); McMullen v. Astrue, 05-CV-1484, 2008 WL 3884359, at *6 (Aug. 18, 2008);   Brown v. Barnhart, No. 01-CV-2962, 2002 WL 603044, at *5-7 (E.D.N.Y. Apr.15, 2002)("In sum, because the ALJ did not properly apply the legal standard in Social Security Ruling 96-8p for assessing residual functional capacity, I cannot properly conclude that his finding that the claimant retained the residual functional capacity to do her past work was supported by substantial evidence."); Matejka v. Barnhart, 386 F.Supp.2d 198, 208 (W.D.N.Y.2005) ("The ALJ's decision did not address the plaintiff's ability to sit, stand, or walk ... Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC, his determination that she had the RFC for sedentary work is not supported by substantial evidence."); but see Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007)(sustaining ALJ's decision, notwithstanding failure to provide function-by-function analysis); Novak v. Astrue, No. 07 Civ. 8435, 2008 WL 2882638, at *3 & n. 47 (S.D.N.Y. July 25, 2008)("The A.L.J. must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports her conclusions, and discussing the claimant's ability to maintain sustained work activity, but

21

she need not provide a narrative discussion for each function."); Martin v. Astrue, No. 05-CV-72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that the ALJ grouped the functions in his function-by-function analysis because "treating the activities separately would not have changed the result of the RFC determination").

This Court is inclined toward the view that, in limited circumstances, the ALJ's failure to provide a function-by-function analysis might constitute harmless error, provided (for example) that the absence of the analysis did not frustrate meaningful review of the ALJ's overall RFC assessment.[6] However, the issue need not be resolved in this particular case. Given that remand is recommended on other grounds, this Court suggests that remand likewise be ordered for the ALJ to provide a function-by-function assessment of Plaintiff's exertional limitations, as required under SSR 98-6p.

### d.   Credibility

The claimant's credibility is an important element in DIB and SSI claims, and such evidence must be thoroughly considered. See Ber v. Celebrezze, 333 F.2d 923 (2d Cir.1994). Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony. See Brandon v. Bowen, 666 F.Supp. 604, 609 (S.D.N.Y.1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged.

---

[6]Several courts have recognized the general applicability of the harmless error rule to the review of disability denial claims. See, e.g., Duvergel v. Apfel, No. 99 Civ. 4614, 2000 WL 328593, at *11 (S.D.N.Y. Mar.29, 2002); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y. Sept.26, 1995).

<u>See</u> 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96-7p; <u>Gernavage v. Shalala</u>, 882 F.Supp. 1413, 1419 (S.D.N.Y.1995).

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." <u>Lewis v. Apfel</u>, 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (internal citations omitted).

To this end, the ALJ must follow a two-step process to evaluate the plaintiff's credibility, set forth in SSR 96-7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if the plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination regarding the plaintiff's credibility:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate ... pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of ... pain or other symptoms;

6.     Any measure [Plaintiff] use[s] or ha[s] used to relieve ... pain or other symptoms;

7.     Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds that the plaintiff's contentions are not credible, he or she must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F. Supp 604, 608 (S.D.N.Y.1987)).

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce only some of the alleged symptoms, and that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (T at 191).  The ALJ's decision to discount Plaintiff's credibility was based upon three principal points: discrepancies in the record concerning alcohol abuse, Plaintiff's poor earnings record, and his non-compliance with treatment.

As discussed above, the ALJ placed particular reliance upon the non-compliance with treatment, indicating that Plaintiff's termination from the Behavioral Services Division program suggested "that [the psychiatric] symptoms were not so bad after all." (T at 188).

However, the ALJ did not apply the proper legal standard when considering Plaintiff's non-compliance with treatment.  SSR 96-7p provides, in pertinent part, that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed." Under that ruling, however, an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment

24

"without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id.

In this case, the ALJ placed nearly exclusive reliance on the termination summary provided by the Behavioral Services Division as the basis for his finding of non-compliance. For the reasons outlined above, that summary appears to contain incorrect information and the termination may well have been hasty on the part of the facility.  In any event, even assuming that Plaintiff was terminated for the reasons stated in the summary, the ALJ had an opportunity to ask Plaintiff to explain his non-compliance with treatment, but failed to do so.  At the outset of the hearing, Plaintiff told the ALJ that he was no longer treating at the Behavioral Services Division.  (T at 389).  The ALJ did not ask any follow-up questions as to why Plaintiff discontinued treatment.  Plaintiff later indicated that he never learned to drive (T at 391), which at least suggests a possible explanation for his failure to attend treatment sessions.  Further, the ALJ could have used the hearing to explore the apparent factual discrepancy in the termination summary (*e.g.* by asking Plaintiff to state or at least estimate the number of missed appointments).

Alternatively and/or additionally, the ALJ could have re-contacted the facility to request an explanation of its termination decision.  At the very least, SSR 96-7p required some meaningful development of the record in this regard before the ALJ reached the conclusion that the reason for non-compliance was that Plaintiff's "symptoms were not so bad after all."  Lastly, the ALJ stated that Plaintiff "has been using medications for anxiety and depression but apparently with quite good success." (T at 191).  The ALJ's suggestion of "quite good success" is not accompanied by any supporting citation to the record and,

indeed, is actually contradicted by it.

Accordingly, this Court recommends a remand for reconsideration of Plaintiff's credibility in light of the considerations outlined above.

### e.    Use of the Grids

At step 5 in the sequential evaluation, the ALJ was required to perform a two part process to first assess Plaintiff's job qualifications by considering his physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). In this, and other social security cases, the second part of this process is generally satisfied by referring to the applicable rule of the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid"). See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.1986).

The function of the Grids was succinctly summarized by the court in Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Id.

"The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and

very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. at 667 n. 2; see 20 C.F.R. § 404.1567(a). Upon consideration of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

In this case, the ALJ used the Grids in reaching his disability determination. (T at 192). However, the ALJ's consultation of the Grids was based upon his RFC assessment with regard to Plaintiff's physical and mental limitations, namely that he was capable of performing medium work and that his non-exertional impairments had little or no substantial effect on the routine occupational base of unskilled medium work. (T at 192). The ALJ's RFC determination was impacted by the errors discussed above. As such, the step 5 analysis must be revisited on remand.

### 3.    Remand

"Sentence four of Section 405 (g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405 (g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." Kirkland v. Astrue, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008). Given the deficiencies in the record as outlined above, it is recommended that the case be remanded for further proceedings consistent with this Report and Recommendation.

### 1.    Request for Expedited Hearing and Interim Benefits

Plaintiff filed his application for benefits in November of 2004, nearly six years ago. This is the second time the matter has been reviewed by a federal court and, if this Court's recommendation is adopted, the matter will be remanded for the second time for further administrative proceedings.  In the event of a remand, Plaintiff requests that this Court impose an injunction setting a firm deadline for the Commissioner to provide Plaintiff with a new hearing and order the Commissioner to pay interim benefits.

The Second Circuit has held that district courts have the power to direct that interim benefits be provided to SSI claimants. See Day v. Schweiker, 685 F.2d 19, 24 (2d Cir.1982) (per curiam), rev'd on other grounds, Heckler v. Day, 467 U.S. 104 (1984) (holding district court cannot "prescribe mandatory deadlines with respect to the adjudication of disability claims under Title II of the [Social Security] Act," but declining to "address the propriety of that part of the [d]istrict [c]ourt's order requiring payment of interim benefits"); see also State of New York v. Sullivan, 906 F.2d 910 (2d Cir.1990) (stating that a district court has "remedial power to award interim benefits prior to administrative readjudication of [SSI and Social Security Disability Insurance] claims").

As discussed further below, the initial remand resulted from legitimate confusion on the Commissioner's part concerning whether Plaintiff had waived his right to appear at a hearing before the ALJ.  As such, the responsibility for the delay in this matter cannot be solely attributed to the Commissioner.  Further, although the ALJ had an affirmative and independent obligation to develop the record concerning Plaintiff's non-compliance with treatment, Plaintiff's counsel certainly could have undertaken greater efforts in that regard by, for example, questioning Plaintiff about this issue at the hearing.  This Court's review of the case law indicates that interim benefits are granted sparingly, often when the

claimant is a child, and when the unreasonable delay is substantially attributable to the Commissioner.  See, e.g., Nieves ex rel. Nieves v. Barnhart, No. 02 Civ.9207, 2004 WL 2569488, at *10 (S.D.N.Y. Nov. 12, 2004).  These criteria are not sufficiently satisfied in this case.  Accordingly, this Court recommends that the request for interim benefits and an injunction be denied.

### 2.    Assignment to a Different ALJ

This Court is mindful that courts in this Circuit typically refrain from directing the Commissioner to assign a different ALJ upon remand. See, e.g, Hartnett v. Apfel, 21 F. Supp.2d 217, 222 (E.D.N.Y.1998). However, in limited instances, it is appropriate to consider whether "a fresh look by another ALJ [upon remand] would be beneficial[.]" Vicari v. Astrue, 05 CV 4967, 2009 WL 331242, at *6 (E.D.N.Y. Feb. 10, 2009).

In such circumstances, courts, including the Second Circuit, have directed that a different ALJ be assigned on remand. See, e.g., Kolodnay v. Schweiker, 680 F.2d 878, 880-81 (2d Cir.1982); Maggipinto v. Astrue, 541 F.Supp.2d 477, 479-80 (D.Conn.2007); Hartnett v. Apfel, 21 F.Supp.2d 217, 223 (E.D.N.Y.1998); Sutherland v. Barnhart, 322 F.Supp.2d 282, 292 -293 (E.D.N.Y. 2004); Miles v. Chater, 84 F.3d 1397, 1400-01 (11th Cir.1996); Ventura v. Shalala, 55 F.3d 900, 904-05 (3d Cir.1995).

This Court believes that assignment to a different ALJ on remand is warranted in this particular case.  Some background is necessary to understand the issue.  As noted above, Plaintiff's SSI and DIB applications were filed *pro se*.  After the applications were denied initially, Plaintiff requested a hearing before the ALJ, but signed a waiver of his right to personal appearance. (T at 35).  Plaintiff explained that he would be too nervous and uncomfortable to appear because of his mental impairments. (T at 35).  ALJ Medicis issued

a decision denying Plaintiff's applications in January of 2006. (T at 16-22).  In that decision, the ALJ noted that Plaintiff had waived his right to make a personal appearance at the hearing. (T at 16).  In a letter dated March 20, 2006, requesting review of that decision, Plaintiff indicated that he "had requested to be at the hearing" and expected that this case would not be reviewed until April of that year.  (T at 12).  The Appeals Council denied the request for review.  (T at 6).

Plaintiff retained an attorney and filed an action seeking District Court review.  Judge Treece issued a Consent Order to Remand.  Per the Order, the purpose of the remand was to allow the ALJ "to re-contact all medical sources for complete and update[d] records and clarify plaintiff's wishes with respect to appearing at a hearing and proceed in accordance with those wishes." (T at 194-95).  On remand, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. (T at 198).  The Appeals Council, without faulting the ALJ, noted that it was unclear as to whether Plaintiff intended to waive his right to appear at the hearing. (T at 199).  The ALJ was directed to "offer the claimant the opportunity for a hearing and, in connection therewith, clarify his wishes with respect to appearing at the hearing and proceed in accordance with his wishes." (T at 199).

On remand, ALJ Medicis held a hearing on January 17, 2008.  Plaintiff appeared with his counsel.  After questions by the ALJ and Plaintiff's counsel concerning Plaintiff's limitations, the ALJ began a lengthy colloquy concerning the prior proceedings.  The transcript indicates that the ALJ was annoyed and distressed, to say the least, by the apparent misunderstanding with respect to Plaintiff's waiver of personal appearance.

The ALJ essentially cross-examined Plaintiff as to whether he understood the waiver of personal appearance form and a follow-up letter sent by the Commissioner. (T at 411-

12).  He then engaged in a lengthy defense of the finding that he made in his January 2006 decision to the effect that Plaintiff had waived his right to appear. (T at 412-13).  The defense even included a criticism of the Appeals Council: "That person, Christopher Field, the Administrative Appeals Judge, they're not Administrative Law Judges, and I don't know if they're lawyers of [*sic*] not, at least they're not Administrative Law Judge [*sic*]." (T at 413). ALJ Medicis further stated that the Appeals Judge was "absolutely incorrect." (T at 413). He then proceeded to demand that Plaintiff produce documentary evidence indicating that he had revoked his waiver of appearance.  (T at 414).  The following passage is illustrative:

> Do you want a hearing? Well I'm not sure.  Well I can't tell you that. You have got to make up your mind . . .  I don't want to give anybody a hard time, but we're short-handed here.  But there's nothing in the record. I want that clear.

(T at 415).

The ALJ then asked Plaintiff's counsel if she had anything to say.  She explained that perhaps Plaintiff had misunderstood some of the forms.  Counsel then asked the ALJ whether his file contained the waiver of appearance.  The ALJ responded: "Hearing closed." (T at 415-16).

The ALJ's extended discussion and defensiveness was unnecessary and inappropriate.  As noted above, no one had faulted him for his January 2006 finding that Plaintiff had waived his right to appear.  More importantly, the Appeals Council had not asked him to ascertain whether, in fact, Plaintiff had changed his mind in 2006.  Rather, the ALJ was directed to discern Plaintiff's present wishes in that regard and proceed accordingly.   Instead, the ALJ spent nearly a fifth of the hearing (measured by transcript pages) seeking personal vindication rather than developing the record by, for example,

asking Plaintiff questions about relevant issues. Moreover, the ALJ had no warrant to demand that Plaintiff or his counsel produce documentary evidence not relevant to any issue before him.

This Court is very concerned that, upon a further remand, the ALJ will once again be more concerned about vindicating his prior rulings than obtaining the correct result. Given the tenor of the colloquy as evidenced by the transcript, this Court is concerned wonder whether the ALJ can be fair and impartial in this particular case. The ALJ was quick to dismiss Plaintiff's assertions concerning his mental limitations (notwithstanding the medical evidence supporting those assertions), suggesting possible animus arising from the waiver issue. A fresh look by another ALJ upon remand would clearly be beneficial and the Commissioner should be directed to make such an assignment on remand.

## IV. CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings be denied, the decision of the Commissioner be reversed, that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405 (g) for further administrative proceedings consistent with this Report and Recommendation, and that the Commissioner be ordered to assign a different ALJ on remand.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


Dated:   August 24, 2010

Syracuse, New York


## V. ORDERS


Pursuant  to  28  USC  §636(b)(1),  it  is  hereby  ordered that this Report &
Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy
of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the
Clerk of this Court within fourteen (14) days after receipt of a copy of this Report &
Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b)
of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION
WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE
OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE**

**DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**

Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not*, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

SO ORDERED.

August 24, 2010

Victor E. Bianchini
United States Magistrate Judge

34